OPINION
{¶ 1} Defendant-appellant, Jeremy Allen McDaniel, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to a jury verdict, of the lesser included offense of murder in violation of R.C. 2903.02, with specification, and having a weapon while under disability in violation of R.C. 2923.13. Defendant assigns a single error:
THE VERDICT IN THE TRIAL COURT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. Because the judgment of the trial court is not against the manifest weight of the evidence, we affirm.
 {¶ 2} By indictment filed October 19, 2004, defendant was charged with one count of aggravated murder in violation of R.C.2903.01, with a specification under R.C. 2941.145, and one count of having a weapon while under disability. Pursuant to a jury trial commenced on December 12, 2005, defendant was found guilty of the lesser included offense of murder, as well as the weapon under disability charge. The trial court sentenced defendant to 15 years to life on the murder conviction, to be served concurrently with a four year sentence on the weapon under disability charge.
 {¶ 3} In his single assignment of error, defendant contends the judgment of the trial court finding him guilty of murder is against the manifest weight of the evidence. When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387; State v. Thompkins
(1997), 78 Ohio St.3d 380, at 387 (noting that "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"). Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The jury thus may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part or none of a witness's testimony." State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing State v. Antill (1964),176 Ohio St. 61, 67.
 {¶ 4} According to the state's evidence, Andrew Ross, a police officer with the City of Columbus Division of Police, was working the 11:00 p.m. to 7:00 a.m. shift on July 25, 2004. He received a call reporting a shooting, went to the rear of a motorcycle club that served as an after-hours bar, and observed the victim lying in the parking lot with what appeared to be a gunshot wound to the head. The victim was removed to a hospital, where he succumbed to the gun shot wound.
 {¶ 5} In challenging the manifest weight of the evidence finding him guilty of the murder, defendant relies heavily on the testimony of Michael Casey to support his contention that he acted in self-defense. To justify the use of deadly force in defending himself, defendant was required to prove by a preponderance of the evidence that: "(1) the slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger."State v. Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus.
 {¶ 6} Casey testified he went with his cousin, Larise Jones, to a Lil Scrappy concert at Studio 69 on the evening of July 24, 2004. Following the concert they went to "what is a motorcycle club or an after-hour," Ruth's on Maryland Avenue, where they arrived about 3:00 a.m. (Tr. 45.) Clarence Jones, Larise's brother, did not attend the concert with his brother, but met him at the motorcycle club at about 3:30 a.m. According to Clarence, Larise called him and said someone was following him from the concert to the motorcycle club; Larise wanted Clarence to bring a gun to the club. When Clarence arrived at the club, he gave Larise a gun. Larise told Clarence he later was going to his girl's house and he had a lot of money on him. Clarence did not stay long at the club, but he saw defendant there.
 {¶ 7} According to Casey, defendant whispered something in Larise's ear as the after-hour activities started coming to a close. When defendant and Larise got out to the parking lot, an argument ensued. Defendant asked Larise, "[w]hat's that shit you was talking inside the after-hour[?]" Larise responded, "what, man, I don't know you." (Tr. 46.) At that point, Larise pulled out the gun Clarence had given him and pointed it at defendant, saying "I don't know you[.]" (Tr. 47.) Defendant acted like he did not have a gun, and Casey did not see one at the time. Casey attempted to settle the situation and stayed with Larise until they walked across the street. At that point, Larise said something like, "I better go back and get that dude before he gets me." (Tr. 58.) Larise then ran back across the street, where defendant had a gun; Casey walked about five to six feet behind Larise as he headed toward defendant. When Casey heard gunshots, he ducked around a car; when Casey got back around the car, Larise was lying on his back on the ground and defendant was running.
 {¶ 8} Premised on Casey's testimony, defendant first argues he was not at fault in creating the situation that gave rise to the incident, as Larise approached defendant outside the club with a drawn gun and pointed it at defendant. Although Larise then ceased the confrontation and crossed the street, he returned in order to get the better of the situation. Second, defendant contends he had an honest belief he was in imminent danger of great bodily harm, as Larise was brandishing a weapon in his face. Lastly, he asserts he violated no duty to retreat or avoid danger, as he had no duty to retreat in the circumstances of this case. Contending he established self-defense by a preponderance of the evidence, he contends the jury clearly lost its way.
 {¶ 9} The state, however, also presented the testimony of Rayshawn Dickerson, a life-long friend of Larise. On July 24, 2004, he, too, went to the Lil Scrappy concert; he arrived at about 10:00 p.m. and left the concert about 2:30 a.m. While there, he and Larise had a photo taken to show off their money and jewelry. After the concert was over, the crowd split him and Larise; Rayshawn did not arrive at the after-hours club until about 4:00 a.m. He met up with Larise at the club and stayed for about one-half hour.
 {¶ 10} While he was there, defendant approached Larise and asked him some questions about what Larise was staring at, or "mugging." Larise asked what defendant was talking about, but defendant kept asking what Larise was "mugging." Rayshawn was on his cell phone and told the woman he was talking to that Larise was in some trouble and they were going to get out of there as soon as it was over. He then heard gunshots.
 {¶ 11} Rayshawn testified Larise had a gun that was visible, but Larise was holding it at his side, "just letting him know that he had the gun." (Tr. 81.) According to Rayshawn, defendant pushed Larise with one hand, drew his weapon and shot with the other, and fell on top of Larise as he was shooting. Rayshawn heard three shots. Rayshawn testified Larise did not threaten defendant. Contrary to Casey's testimony, Rayshawn never saw Larise leave and come back.
 {¶ 12} Given Rayshawn's testimony, the jury could reasonably conclude that defendant initiated the confrontation through his taunting questions to Larise; defendant had no reasonable fear of imminent death, as Larise, though he had a gun, was not brandishing it at defendant; and, under the circumstances Rayshawn relayed, defendant could have simply walked away from the confrontation.
 {¶ 13} As additional support for Rayshawn's testimony, the state presented the testimony of Celia Watts. Defendant knew both her and her daughter. According to Watts, defendant informed her that her daughter owed defendant some money. To collect the money, he threatened Watts' daughter, stating "he would do the same thing he did to this boy that was at Ruth's after-hour joint." (Tr. 136.)
 {¶ 14} Although she at first did not understand what defendant meant, she inquired. He explained that Larise, Clarence, or both of them, set defendant up to be robbed, so he told Larise "to tell his mom that she better wear black. And then Reese [Larise] looked at his friend that was with him and said, did you hear what that nigger said? And then he turned back around and looked at [defendant] and [defendant] shot him in the head." (Tr. 136-137.) Defendant further told Watts that if her daughter was playing with him, he would do the same thing to her. Afraid for her daughter's safety, Watts called the police who ultimately arrested defendant for the homicide.
 {¶ 15} With that testimony, the jury could conclude defendant contemplated murder and killed Larise out of either anger or revenge, not self-defense. Such a conclusion is further supported with evidence indicating defendant fired at least three shots at the victim, one entering the top of his head, one going into his jaw, and the other into his chest. "The firing of multiple shots undercuts a claim of self-defense." State v. Hall, Franklin App. No. 04AP-17, 2005-Ohio-335, at ¶ 40, reversed on other grounds, In re Ohio Criminal Sentencing Statutes Cases,109 Ohio St.3d 313, 2006-Ohio-2109, citing State v. Brown, Franklin App. No. 03AP-858, 2004-Ohio-5064, at ¶ 31.
 {¶ 16} Without question, the evidence was conflicting in some particulars. Conflicting evidence and inconsistencies in the testimony, however, generally do not render the verdict against the manifest weight of the evidence. Raver, at ¶ 21; State v.Thompson (1998), 127 Ohio App.3d 511, discretionary appeal not allowed, 83 Ohio St.3d 1451 (stating that "[a] reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder"); State v. Craig (Mar. 23, 2000), Franklin App. No. 99AP-739, citing State v. Nivens
(May 28, 1996), Franklin App. No. 95APA09-1236 (noting that "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence").
 {¶ 17} The trier of fact is in the best position to take into account conflicting evidence and inconsistencies, along with the witness' manner and demeanor, and to determine whether the witness' testimony is credible. State v. Williams, Franklin App. No. 02AP-35, 2002-Ohio-4503, at ¶ 58; State v. Clarke
(Sept. 25, 2001), Franklin App. No. 01AP-194. Thus, jurors need not believe all of a witness' testimony, but may accept only portions of it as true. Raver, at ¶ 21; State v. Burke,
Franklin App. No. 02AP-1238, 2003-Ohio-2889, citing State v.Caldwell (1992), 79 Ohio App.3d 667. Although an appellate court acts as a "thirteenth juror" when considering the manifest weight of the evidence, it must also give due deference to the factfinder's determination of the witness' credibility. State v.Covington, Franklin App. No. 02AP-245, 2002-Ohio-7037, at ¶ 28;State v. Hairston, Franklin App. No. 01AP-1393, 2002-Ohio-4491, at ¶ 74.
 {¶ 18} Here, the jury reasonably could have concluded that defendant was seeking to avenge Larise's attempt to set defendant up for a robbery; that Larise, though armed, was not pointing the weapon at defendant but holding it at his side; that defendant taunted Larise, pushed him, and shot him. Because the evidence allows the jury to so reasonably conclude, its verdict is not against the manifest weight of the evidence. Defendant's single assignment of error is overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
Travis and Whiteside, JJ., concur.
Whiteside, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), ArticleIV, Ohio Constitution.